```
 1              IN THE UNITED STATES BANKRUPTCY COURT
                FOR THE EASTERN DISTRICT OF TEXAS
 2                       TYLER DIVISION

 3

 4    N RE:                 )  BK. NO: 24-60363-JPS

 5                          )

 6  EARTHSNAP, INC.         )

 7         D E B T O R.     )

 8

 9

10             *  *  *  *  *  *  *  *  *  *

11             TRANSCRIPT OF PROCEEDINGS

12             *  *  *  *  *  *  *  *  *  *

13

14

15

16

17

18

19

20      BE IT REMEMBERED, that on the 25th day of March, 2025,

21  before the HONORABLE JOSHUA P. SEARCY, United States

22  Bankruptcy Judge at Tyler, Texas, the above styled and

23  numbered cause came on for hearing, and the following

24  constitutes the transcript of such proceedings as hereinafter

25  set forth:
```

1                          <u>I N D E X</u>

2                                                              <u>PAGE</u>

3    <u>ERIC RALLS</u>

4         REDIRECT EXAMINATION
              BY:  Mr. Wiley                                  5

5

6

7

8

9

10

11

12

13

14

15                 <u>E X H I B I T   I N D E X</u>

16                                       <u>PAGE FIRST REFERENCED</u>

17   Debtors' Exhibit 1                          14

18   Debtors' Exhibit 14                          5

19

20

21

22

23

24

25

```
1                    P R O C E E D I N G S
2              COURTROOM DEPUTY:  Hi, good morning.  We're
3    here on a hearing's continuation -- hearings continued from
4    last week on the 19th in EarthSnap, 24-60363, Chapter 11
5    Subchapter V, on the status conference regarding confirmation
6    of the Chapter 11 Small Business Plan, order to show cause
7    why case should not be dismissed or converted, and the joint
8    motion to convert Chapter 11 case to Chapter 7 case.
9              THE COURT:  Good morning.  If I could have
10   appearances, please.
11             MR. WILEY:  Good morning, Your Honor.  Kevin
12   Wiley on behalf of the debtors.
13             MR. RALLS:  Your Honor.  Eric Ralls.
14             MR. MELITO:  Good morning, Your Honor.
15   Michael Melito for Greenmind.  My pro hac vice application is
16   still pending.
17             THE COURT:  Okay.
18             MS. SAX-BOLDER:  Good morning, Your Honor.
19   Amalia Sax-Bolder on behalf of HI Investments, LLC.
20             THE COURT:  Anybody else?
21        Do we know, Ms. Sax-Bolder, is Mr. Akers or Mr. Thomas
22   going to participate?
23             MS. SAX-BOLDER:  I -- Mr. Akers is on the
24   line, but I can't hear him.  So I don't know if anyone else
25   can hear him.
```

```
1              COURTROOM DEPUTY:  Mr. Akers, I can't --
2  you're -- it says you're not muted, but we cannot hear you.
3              MR. AKERS:  I apologize.  Can you guys hear me
4  now?
5              COURTROOM DEPUTY:  Yes.  Thank you.
6              MR. AKERS:  I apologize.
7        Your Honor, Patrick Akers on behalf of PlantSnap.
8              THE COURT:  All right.
9              MS. SAX-BOLDER:  And then as discussed at the
10  prior hearing, I believe Mr. Thomas has a doctor's
11  appointment and he'll join when he can.
12             THE COURT:  Right.  Okay.
13        I guess, Ms. Davis, maybe let me know if and when he
14  pops up so we can let him make an appearance.
15        Okay.  Well, where we -- my memory is when we ended the
16  day on Thursday, I believe it was, or Wednesday, we were
17  ready for -- Mr. Wiley, I think you were going to redirect
18  Mr. Ralls; is that right?
19             MR. WILEY:  That is correct, Your Honor.
20             THE COURT:  Okay.  All right.
21        Then, Mr. Ralls, since it's a new day, we will re-swear
22  you in.
23        Ms. Davis, if you will do that.
24             (The witness was sworn by the courtroom deputy.)
25             THE COURT:  All right.  Then, Mr. Wiley, I
```

1   think the floor is your's.

2              MR. WILEY:  Thank you, Your Honor.

3                    <u>ERIC RALLS</u>

4    The witness, having been duly sworn to tell the truth,

5   testified on his oath as follows:

6                 <u>REDIRECT EXAMINATION</u>

7   BY MR. WILEY:

8       Q.   Mr. Ralls, as you recall during the direct or

9   cross-examination there were serious questions raised with

10  respect to whether or not your plan of reorganization was

11  viable for feasible.  So I would ask prior if you'd pull up

12  Exhibit 13, make that Exhibit 14 with respect to the

13  financial projections, Mr. Ralls, that --

14             MS. BILLINGHAM:  Can I please get permission

15  to share?

16             COURTROOM DEPUTY:  Okay.  Hold on one second

17  for me.

18      Mr. Wiley, it is very hard to hear you, the distance

19  you are from your computer and then when you turn to look at

20  papers.  Our Courts cannot pick you up on the recording, so

21  if you could speak a little bit louder.

22             MR. WILEY:  I'll make sure that I direct my

23  questions to the computer.  I'm sorry.

24             COURTROOM DEPUTY:  Is that better?  That is

25  better.  Thank you very much.

1          And, I'm sorry, who is needing to share a screen?  Can

2    you please repeat that?

3          (No decipherable response due to two people speaking.)

4                    COURTROOM DEPUTY:  Okay.  You should be able

5    to now.

6                    MS. BILLINGHAM:  Thank you.

7                    COURTROOM DEPUTY:  You're welcome.

8          Q.   Mr. Ralls, if you could first explain that your

9    plan of reorganization that had an Exhibit A that you were

10   cross-examined about only had projections with respect to the

11   EarthSnap business.  Could you distinguish the EarthSnap

12   business from the exhibit that Ms. Billingham is about to

13   present to you?

14                   MS. BILLINGHAM:  I apologize.  Which exhibit?

15                   MR. WILEY:  Exhibit 14.

16                   MR. AKERS:  Your Honor, I'm going to object to

17   this exhibit as untimely, the LDR, 9014-1(d).

18                   MR. WILEY:  Your Honor, this is a rebuttal

19   exhibit.  We had a list of rebuttal exhibits in Exhibit 11

20   that was timely filed.  And we certainly have the right to

21   rebut inferences and evidence that was submitted in the

22   cross-examination.

23                   THE COURT:  Mr. Akers, isn't Exhibit 14 your

24   exhibit?

25                   MR. AKERS:  No, Your Honor, it's not.  Exhibit

1   14 -- Movant's Exhibit 14 is the plan.  And this is Debtors'

2   Exhibit 14.

3                   THE COURT:  Which -- okay.  This is why,

4   Mr. Wiley, we --

5                   MR. WILEY:  The document was not ready --

6                   THE COURT:  No, I'm speaking.

7                   MR. WILEY:  -- for the filing on the date

8   that --

9                   THE COURT:  I'm speaking.

10                  MR. WILEY:  -- was --

11                  THE COURT:  Mr. Wiley, I'm speaking.

12                  MR. WILEY:  Yes, sir.

13                  THE COURT:  This is why we have a rule about

14  exhibits where letters are for the non-movant and numbers are

15  for the movant, because I don't know what Exhibit 14 we're

16  talking about.  And you did not say Debtors' Exhibit 14, if

17  that's what we're supposed to be looking at.  If it is

18  Movant's Exhibit 14, that's what I've got pulled up.  So

19  which Exhibit 14 are we talking about?

20                  MR. WILEY:  Debtors' Exhibit 14.

21                  THE COURT:  Debtors' Exhibit 14 has not been

22  admitted.  And so in order to try to admit it, we have to lay

23  a foundation first.  And -- yeah, so why don't we start

24  there.  We'll see if we can do that or not.

25                  MR. WILEY:  Yes, sir.

1    Q.    Mr. Ralls, can you identify to the Court what

2    Debtors' Exhibit 14 consists of?

3    A.    Is that's what on the screen right now?

4    Q.    Yes.

5    A.    This is Earth.com revenue every month of 2024 and

6    the first two months of 2025.  This would go directly to

7    showing that the progress that has been made since I've been

8    under the protection of the Court and Chapter 11 Sub V.  How

9    I've been able to grow the business to the point where it can

10   easily pay off all 100 percent of my debt, not just debt owed

11   to PlantSnap and DEJ.  It goes to show the turnaround of the

12   company that I've been able to do since I've had space and

13   breathing room to focus on work.

14   Q.    And is it a business document that's created from

15   your business file?

16   A.    This is a projection -- I didn't -- I wasn't aware

17   that I was supposed to create projections and I don't -- as I

18   mentioned last time, I don't know what the projections were

19   in the payment plan.  I created this whenever we brought on

20   Greg Mitchell and the Freeman Law Firm who mentioned, where

21   were the projections?  So I made these last week.  I wasn't

22   aware that this was supposed to be submitted with -- at the

23   same time, that was the same week that Mr. Wiley's son passed

24   away, so there was a communication lapse.

25   Q.    Is this a business record, Mr. Ralls, that you have

1    management custodianship of?

2        A.    Yes.   I created this.   Is that what you're asking

3    me, did I create this?

4        Q.    Yes, sir.

5        A.    Yes, I did.

6            MR. WILEY:   I move for the admission of

7    Exhibit 14.

8            MR. AKERS:   Your Honor, I will renew my

9    objection as untimely under Rule 9014-1(b).

10           MR. WILEY:   Your Honor, I will request the

11   Court's attention to the fact that we filed an exhibit list

12   that included rebuttal exhibits that would reflect -- this is

13   associated with the cross-examination of Mr. Ralls.   And

14   there was no limitation as to what those rebuttal exhibits

15   would be.   They're supplemental exhibits that were filed with

16   the Bankruptcy Court and have been available to opposing

17   counsel for four days, so it's not a surprise.

18           THE COURT:   Well, I'm not going to do

19   Mr. Akers' work for him, because that's not my job.   But I

20   think, if I'm understanding, Mr. Akers, you're objecting

21   because this was not filed by March the 14th which was, as I

22   recall, the deadline for exhibits for the hearing last week;

23   is that right?

24           MR. AKERS:   Yes, Your Honor.   This was filed

25   at Docket Number 122 on March 18th outside of that window.

1    And I believe this is not a rebuttal exhibit, because this is

2    not addressing the projections that were discussed at

3    Movant's Exhibit 14.  This is an entirely new exhibit that

4    they are trying to get in under the guise that it is

5    rebuttal.

6                THE COURT:  I mean, I'm wondering really why

7    this is relevant to what we're here about.  Because this

8    projection is about Earth.com, but what we're here about is

9    EarthSnap and its plan of reorganization, which, am I right,

10   this projection for Earth.com is not a part of the plan that

11   was filed that was Movant's Exhibit 14 that we saw the other

12   day.  And though I think we heard testimony that Earth.com

13   and EarthSnap are both owned by Digital Media, which is in

14   turn owned by Mr. Ralls who is the debtor, I mean, Earth.com

15   is not a debtor, right?  And no one has told me that there is

16   some legal obligation on the part of Earth.com to pay its

17   income to EarthSnap, right, Mr. Wiley, or am I missing

18   something?

19               MR. WILEY:  That's incorrect, Your Honor.  The

20   plan of reorganization proposes a contractual obligation of

21   Earth.com to be a plan supporter.  And the plan of

22   reorganization, which has been admitted as Exhibit 1,

23   Debtors' Exhibit 1 has an addendum plan support agreement.

24   And Earth.com has committed to permit its resources to the

25   payment of payments and claims under the EarthSnap plan of

1  reorganization.  So that's why it is relevant.  And

2  everything that Earth.com does is a contributory part of the

3  plan of reorganization.  And the plan of reorganization's

4  feasibility is being attacked based upon simply the EarthSnap

5  revenues.  And there's a plan supporter agreement that says

6  there's going to be additional revenue from another source.

7  And that is a rebuttal exhibit.

8               THE COURT:  Mr. Akers?

9               MR. AKERS:  Mr. Wiley is correct in terms of

10 under the proposed plan that EarthSnap -- or that Earth.com

11 will effectively be funding the entirety of the debtors'

12 reorganization.  With that said, Your Honor, the projections

13 have nothing to do with the projections that were attached to

14 that plan.  These are wholly new.  And this is just an

15 attempt to squeeze something in under the guise of this is a

16 rebuttal, even though this is far outside of that.

17              THE COURT:  Give me a sec.

18       Why was this filed late, Mr. Wiley?

19              MR. WILEY:  Because it didn't exist.

20              THE COURT:  Well, I don't think that's a

21 reason for me to allow it if it's late.  You know, I don't

22 think I can allow this.  It was late.  That's why we have

23 rules.  Not only is it late, it's not labeled correctly.  So

24 I can't admit this.

25              MR. WILEY:  But, Your Honor, this is

1  rebuttal -- this is a rebuttal exhibit.  And it's not late

2  because we identified that there would be rebuttal exhibits

3  that would be supportive in connection with our case.  If, in

4  fact, there was evidence that was created in the direct or

5  cross-examination that created the need for rebuttal, we

6  proposed that there would be rebuttal exhibits and we timely

7  filed that on the March 14th date.  So I don't understand the

8  reluctance to allow rebuttal exhibits that rebut testimony

9  that's been brought into cross-examination or direct

10 examination.

11         THE COURT:  I don't understand what this is

12 rebutting.  I mean, Mr. Akers seems to be right, this is new.

13 This is something that's new and totally different.

14         MR. WILEY:  Mr. -- Mr. Akers raised a point

15 that the plan was never reliable.  It had no feasibility.

16 It's definitely directly related to rebuttal.  If it's dead

17 on arrival because it doesn't have the ability to fund,

18 whether the evidence supporting the dead on arrival, the fact

19 that the exhibits that were there on the 14th of March,

20 basically as the Exhibit A showing that EarthSnap worked out

21 the Earth.com contribution.  So, therefore, the rebuttal

22 exhibit is Earth.com does support the EarthSnap circumstances

23 so that there is a not dead on arrival plan.  And that's

24 directly toward rehabilitation.

25         THE COURT:  Okay.  Well here's the deal.  It's

1    not labeled right.  I don't think it was filed on time.  That

2    being said, I don't know how helpful it's going to be,

3    frankly, to me either.  So I'll allow it.  But, Mr. Akers, I

4    don't know how helpful it's going to be to me.  So, you know,

5    whether or not it gets much weight, we'll see.

6         Go ahead, Mr. Wiley.

7              MR. WILEY:  Thank you very much, Your Honor.

8         Q.   Mr. Ralls, go ahead and explain the exhibit to the

9    Court with respect to what the Earth.com contribution is

10   intended to be to the plan of reorganization.  If you could

11   just summarize it briefly without too much detail.

12        A.   Yes.  This is a financial -- ever since --

13   Earth.com and EarthSnap, they are sister companies under the

14   Digital Earth Media umbrella.  They share content.  They

15   share -- they cross promotions.  Earth.com is the website

16   portion and it's the first one of two large revenue streams.

17   We have a year of data, actual data behind in the spreadsheet

18   that shows revenue earned every month in 2024.  Gross profit

19   margin every month in 2024.  And it also shows the January

20   and February revenue and gross profit margins which show year

21   over year increases of 217 percent and 222 percent

22   respectively from January '24 to January '25, February '24 to

23   February '25, which puts us on track to approach $5 million

24   in revenue this year alone for only Earth.com.

25        On top of that it shows the traffic numbers that we

1  have at Earth.com and how much those have grown.  Since I

2  came under bankruptcy protection right now we average around

3  10 million visitors a month.  On Saturday we actually had 1.4

4  million visitors in one day.  That -- those visitors are the

5  basis of the EarthSnap financial projections, which are also

6  in evidence and how we plan to grow EarthSnap organically

7  using the traffic that has already been accumulating and

8  growing on a monthly basis on Earth.com.

9       Q.   So basically the Exhibit A that's in connection

10  with the Debtors' Exhibit 1 only showed the, if you will,

11  EarthSnap revenue that would then increase by 5 percent.

12  This document amplifies the revenue projections from Exhibit

13  A and the disclosure statement?

14       A.   No, Kevin.  I think I addressed this in the last

15  hearing.  The exhibit that you attached to the payment

16  plan -- now this is the same week your son died.  I'd never

17  seen that exhibit.  I didn't make it.  It has nothing to do

18  with EarthSnap revenue at all.  And I don't know what that

19  was.  I wasn't asked to create projections, or I would have

20  done so.  We had a communication breakdown and there -- this

21  is just another example of it, which is why I hired Greg

22  Mitchell and Jason Freeman to come in and help me right the

23  ship in terms of the administrative issues that we've come

24  under as a direct -- as a result of your health and your

25  family issues.

1        This is a difficult -- this is a tight rope I have to

2    walk, because I respect Kevin immensely and he was going

3    through a really hard time.  And at the same time, I wasn't

4    told things I needed to do.  And we missed deadlines.  And

5    when I did find out about deadlines I missed, Ms. Aurzada for

6    one can vouch to this, I didn't know I owed her $3,500 for

7    her payment until it came up in a hearing.  So ultimately I

8    had to reach out to her directly, find out how much I owed

9    her, find out how much I needed to pay her, and I overnighted

10    her a cashier's check.  That's -- I can take action when I

11    know there's deficiencies.  And that's one example of it.

12        Q.   Yeah.  But the bottom line, Mr. Ralls, is that this

13    exhibit will take the place in a modification of the Exhibit

14    A that's in the continued and existing plan of

15    reorganization?

16        A.   Yes.  This exhibit, yes.  And also the other

17    exhibit of EarthSnap financial projections, yes.  There's two

18    different exhibits that will take the place of A in the

19    payment -- in the plan of reorganization.

20        Q.   And this was the most correct (indecipherable word)

21    about the future of the company?

22        A.   This particular one that we're looking at right now

23    is about Earth.com which is one part of the company that

24    they're attempting to seize my stock in.  The other part of

25    the company is EarthSnap.

1    Q.   The combination of Earth.com and EarthSnap will

2  generate what type of revenue for the future of the company?

3    A.   This year over $5 million.  And into the future it

4  will approach 15 million over the next five years, per year.

5    Q.   So the existing Exhibit A projects $5 million,

6  accumulating a 10 percent increase per year.  This Exhibit A,

7  which is a corrected Exhibit A that (indecipherable word) and

8  demonstrates a greater (indecipherable word due to audio

9  cutting out) of financial projections, correct?

10    A.   Yes.  This is based off of real world numbers.  But

11  it's also only for Earth.com.  It doesn't take into affect

12  the second revenue stream, which is the other company,

13  EarthSnap, which launches on Earth on April 2nd, the start of

14  Earth month.

15    Q.   So to help the Judge, to help the Court, to help

16  all of the parties, you've got a liability situation of

17  approximately $5 million, correct?

18    A.   Correct.

19    Q.   And you believe that your financial projections

20  from existing business of EarthSnap and existing business of

21  Earth.com will generate more than that $5 million?

22    A.   It should -- I think it will generate more than

23  that just in 2025 alone more than $5 million.  It will at

24  least get close.  But over the next five years, it will

25  generate 5 to 10x that amount, yes.

1      Q.    Okay.  Now, historically what have you done with

2   this Earth.com to this point, to help us understand the

3   credibility of your numbers?

4      A.    Earth.com filed for Chapter 11 Sub V in June.  At

5   that point in June of 2024 our revenue was 25, around $25,000

6   and our traffic that month was roughly around 1.1 million

7   visitors for the month.  When we got under that protection

8   and I wasn't having to spend money on attorneys and time on

9   answering the complaints from Mr. Akers and his team, for the

10  next six months it was dramatic and very impressive growth in

11  both revenue and traffic.  In July it jumped from 25,000 in

12  revenue to 77,000 in revenue.  In August it jumped up to

13  101,000 in revenue.  September revenue jumped to 275,000.

14  October revenue was 214,000.  November revenue was 270,000.

15  And December revenue was 513,000.

16       Then you move --

17      Q.    That's Earth.com, not EarthSnap, right?

18      A.    That's Earth.com.  EarthSnap relaunches in -- on

19  April the 2nd, next week, which is the beginning of Earth

20  month.

21      Q.    Can you -- can you explain to the Court why

22  EarthSnap has not had active activities before the launch on

23  April 2nd?

24      A.    It's had activity.  I tried to launch it -- we

25  built it back in 2022, 2023.  And at that time, because

1  all -- PlantSnap and DEJ have paid Akers & Thomas millions of

2  dollars over the past four years to find ways to, legal ways

3  in the legal system to manipulate the legal and steal

4  PlantSnap from me.  They were highly effective in doing that.

5  Then they decided to move on to the new companies I was

6  building and brought new -- brought them into the action.  So

7  then I had to start -- once I -- as soon as we got EarthSnap

8  built and launched, I had to immediately start defending

9  lawsuits against EarthSnap and Earth.com.  The biggest of

10  which was dismissed with the help of Mr. Melito.  I don't

11  know how -- the proper term for that.  But all I do, three or

12  four years fighting these guys nonstop and trying to build

13  startups at the same time and it's pretty much impossible.

14  And I think you can see, and the numbers speak for

15  themselves, the one time over the case -- over the past four

16  years that I didn't have to fight those two guys, I did

17  really well and I'm continuing to do really well.  I've got

18  it where it should have been from the beginning.  And I can

19  pay back everyone 100 percent of everyone and I can fulfill

20  my goals.

21      At the same time, I'm helping the planet.  This isn't

22  just some company that sells widgets or makes video games.

23  This is teaching people about the earth and why it's

24  important to care about nature and care about the earth and

25  get -- using technology to get them out and interacting with

1   plants and nature to see why it's important to help and to

2   see the problems that we're facing and also good for you to

3   understand the planet.  And I love my job.  It's -- it's

4   great.  I've touched hundreds of millions of people around

5   the world with these -- with PlantSnap and Earth.com and now

6   EarthSnap coming up.  And I think that's important.  It's one

7   thing we haven't discussed yet is, you know, the nature of

8   these companies on top of the fact that they can generate

9   enough revenue to pay off the debt.

10      Q.   Now in the cross-examination of opposing counsel

11  they raise confirmation issues with respect to your plan of

12  reorganization.  One of them was 1129(a)(3) that says then

13  plan's proposed in good faith and not by any means forbidden

14  by law.  Is your plan proposed in good faith?

15      A.   Yes.  I'll say it once again.  My plan is to repay

16  100 percent of all debt.  I'm not trying to lower anyone's

17  debt or take out anyone or -- I've always said I want to pay

18  100 percent of the debt.  That is in good faith.  And I think

19  I've now demonstrated that I can pay off 100 percent of the

20  debt.

21      Q.   Now with respect to this (indecipherable word) of

22  compensation.  Do you intend to modify your documentation to

23  show a executive compensation coming to you and, if so, what

24  is that executive compensation to you?

25      A.   Yes.  I have a bookkeeping firm that -- when I was

1  able to afford to hire one back in November -- working on all

2  of the books to bring them up to date.  And I still need to

3  hire an accountant.  We weren't able to file those documents

4  properly or in a timely fashion I think -- I know because of

5  first, your illness, and then, second, when we did file, your

6  son had passed away and I think there was something missing

7  from the filing.  I don't recall what it was, but we didn't

8  submit something so that was denied.

9       Q.   That was not my question, Mr. Ralls.  My question

10  was, do you intend to disclose the compensation that you're

11  expecting from your company, yes or no?

12       A.   Yes.  I'm going to disclose everything.  I've

13  always disclosed --

14       Q.   Well, what is that compensation?

15       A.   My compensation moving forward -- that's what the

16  bookkeeping is for.  I have to get the books from -- all of

17  the books will show exactly what my compensation has been

18  when we have them.  But --

19       Q.   I'm not worried about what it's been.  I'm worried

20  about what's going to be.  What -- what do you intend to

21  obtain as compensation going forward?

22       A.   Moving forward, assuming that the revenue remains

23  how it is, I would say my compensation moving forward would

24  probably be around 125,000 a year.

25       Q.   Okay.  Now there's also been a question raised with

1  respect to your compliance with the provisions of Title 11.

2  Have you retained professionals without Court approval as it

3  was alleged in the cross-examination?

4      A.    No.  We -- you told me that I did not need Court

5  approval for bookkeepers, but I did need Court approval --

6  but I did need Court approval for an accountant.  And we

7  attempted to get Court approval for an accountant, which is

8  vital to any business, but we were unable to do that.

9      Q.    Okay.  So, therefore, you have not retained an

10  accountant for the debtors to this date?

11      A.    The debtors do not have -- no.  The debtors do not

12  have an accountant to this date.  I need to get that as soon

13  as I possibly can.

14      Q.    Now the gorilla in the room is $1,350 that was paid

15  to the Wiley Law Group.  Do you recall that that was an

16  expense reimbursement for filing fees associated with the

17  Greenmind transaction?

18      A.    I don't recall exactly what that was for.  I know

19  that you did create the Greenmind company for me and set it

20  all up and that there were fees involved for it.  But that

21  particular transaction on the -- it was on the debit card, I

22  believe, so it would make sense.  It wasn't -- it was a very

23  specific number, so it does make sense that it was not

24  related to any sort of compensation to you, but had --

25      Q.    Because I have not -- I have not requested

1  professional fee reimbursements for fees and expenses owed to

2  the debtors -- or from the debtors in connection with this

3  case to date?

4       A.   No.  No, no, no.

5       Q.   Now, that's not true that non-debtors have involved

6  me also in connection with legal representation and you have

7  made payments from non-debtor accounts, from non-debtor

8  relationships associated with legal fees in connection with

9  those non-debtors; is that correct?

10      A.   That is correct.

11      Q.   Okay.  And so to this date I still have to file an

12 application reflecting both the direct reimbursement and the

13 non-debtor relationships which would allow the judge to

14 either agree that I could accept these funds or have to

15 refund those funds to the estate, correct?

16      A.   I'm not exactly sure how that process --

17      Q.   Well, if the judge doesn't approve my fees received

18 from the non-debtors, I have to pay them back to the estate,

19 yes or no?

20      A.   I believe so.  But that's -- that's an area of law

21 that I don't know the exact statutes.  I don't --

22           MR. WILEY:  At this time, Judge, I would like

23 to turn over the examination to Mr. Melito who's going to

24 walk Mr. Ralls through the expert opinions associated with

25 the competitive nature of the industry, how, in fact, the two

1  creditors that are seeking to have this matter converted

2  benefit from eliminating competition and are not interested

3  in paid.  And don't care what happens to the payment to

4  creditors (indecipherable few words due to audio cutting out)

5  receives the companies.  So if Mr. Melito could take over the

6  direct examination, I would ask the Court to allow him to do

7  that at this time.

8          THE COURT:  So what am I about to hear about?

9          MR. WILEY:  Mr. Melito is going to introduce

10 Mr. Ralls to some expert testimony that's going to be in

11 connection with the industry that exists that create the

12 competitiveness requirements.  We argue, Judge, that the

13 motivation of the movants is to eliminate competitors, not to

14 obtain compensation.

15         MS. SAX-BOLDER:  Your Honor, I'm going to

16 object to that.  I -- we're on a cross-examination.  First of

17 all, Mr. Melito is not an engaged counsel in this matter to

18 represent the debtors.  He represents a third-party entity.

19 Only just filed a pro hac vice.  And this is not a rebuttal

20 testimony.  There was no cross -- there was no

21 cross-examination as to the competitive nature of my client.

22 That's not at issue here.  And this should have been raised

23 on a direct examination.  This is just another example of a

24 trial by fire.  And it's not efficient and it's not a good

25 use of the Court or the parties' time at this point.

```
1                    THE COURT:  Mr. Melito, who's your client?

2                    MR. MELITO:  Greenmind, Your Honor.

3                    THE COURT:  Okay.  Mr. Wiley, who's your

4   client?

5                    MR. WILEY:  The debtors, Your Honor.

6                    THE COURT:  Then how can Mr. Melito for

7   someone else represent your clients, Mr. Wiley, on what last

8   time I checked is redirect of him?  We can't do that.  That's

9   not how the rules work.

10                   MR. WILEY:  I don't believe -- I believe

11  you're right, Your Honor, that we can just bypass that.

12  Mr. Melito will face the issues associated with his

13  presentation when their expert witness testifies with respect

14  to competitiveness.

15                   THE COURT:  Okay.  Well, we're not doing it

16  right now in this way.

17                   MR. WILEY:  Yes, sir.  I agree.  I have no

18  further redirect, Your Honor.

19                   THE COURT:  All right.  Then, Mr. Ralls, I

20  think that concludes your testimony as called by the debtors.

21                   MR. WILEY:  Thank you, Your Honor.

22                   THE COURT:  Okay.  Oh, all right.  And I see,

23  Mr. Thomas, I think that you -- I see where you have joined.

24  Can you hear me?

25                   MR. THOMAS:  Yes, Your Honor, I can hear you.
```

```
 1                    THE COURT:  All right.  Would you, for the

 2    record, like to appear for your client?

 3                    MR. THOMAS:  Yes.  My name is Shane Thomas

 4    with Bell Nunnally & Martin representing Brian Funk, a debtor

 5    in this case -- I'm sorry, creditor in this case.

 6                    THE COURT:  All right.  Okay.

 7         All right, Mr. Wiley, do you have another witness who

 8    you are going to call as a -- as a rebuttal case witness?

 9                    MR. WILEY:  Not as a rebuttal case, Your

10    Honor.  But I have an expert witness will testify with

11    respect to the -- basically we identified him as a witness in

12    the timely filed designation of witness and exhibits.

13    Mr. Melito will take over that examination from me on behalf

14    of Greenmind.

15                    MS. SAX-BOLDER:  Your Honor, again, I'm going

16    to object to an expert witness being admitted in this case.

17    Mr. Wiley did not file an objection to the motion to convert

18    the cases.  And so if he's going to be presenting testimony

19    on an order to show cause, I don't see how possibly this

20    expert could be relevant.  Nor was it properly disclosed to

21    the parties, which is why I don't know if it's relevant

22    because there was no proper Rule 26(f) disclosure that was

23    made about the nature of this testimony.  I don't know if

24    he's been paid.  Truly this expert is a last minute attempt

25    at something.  And I really don't know what it is, but I
```

1   don't believe that it has a place in this trial.

2           MR. WILEY:  May I respond, Your Honor?

3      The trial of this case, we have identified

4   Mr. -- the expert witness that we intended to call in

5   connection with the case.  And his testimony is relevant to

6   the nature of the competitiveness associated with the

7   creditors PlantSnap and HI.  HI is not directly related to

8   PlantSnap, but as he advised in their argument, why would

9   they agree to PlantSnap converting this case to Chapter 7 if

10   they did not have some type of agreement going forward with

11   respect to what would happened with them and with PlantSnap?

12   But that's neither here nor there.

13      The bottom line is our case is based upon the fact

14   that we're alleging that the motion for conversion is brought

15   in bad faith under 1112 because this is not a creditor motion

16   for conversion seeking a creditor result of payment.  This is

17   a motion that's been motivated by the elimination of

18   competition.  Creditors want to have this plan of

19   reorganization.  There's only two parties that do not want to

20   have it and that is PlantSnap and HI.  And they are directly

21   in our industry as competitors.  So the expert witness will

22   testify with respect to these competitors, these issues, and

23   how the motivation of these creditors is prejudiced by their

24   need to eliminate competition, as opposed to receiving

25   payment.  They've been offered payment for 100 percent and

1    they rejected it.  And the reason they rejected it is because

2    if they get control of our company, they get more than 100

3    percent of their payment of their debt.  It's that simple.

4            MS. SAX-BOLDER:  Your Honor, that was complete

5    speculation and full of a lot of fallacies about the state of

6    the current events here.  But irrespective, I believe

7    Mr. Wiley did just admit that this was an attempt at an

8    expert witness in connection with the motion to convert.  But

9    there was no objection that was filed to the motion to

10   convert.  There were no grounds raised for an objection to

11   give creditors notice as to what we would be on trial here

12   today to cover.  And that is in complete violation of the

13   Rules of Bankruptcy Procedure and in violation of Rule 26(f)

14   of the Federal Rules of Civil Procedure.  This is -- this is

15   just simply a trial by fire.  And I'm not going to respond to

16   each of -- each of the points that were very speculative that

17   were raised by Mr. Wiley because I don't believe it's

18   relevant.

19           MR. WILEY:  May I respond, Your Honor?

20           MR. AKERS:  Having heard what Mr. Wiley said,

21   I would object on the grounds of relevance.  I cannot think

22   of anything in your show cause order or Section 1112 that

23   this would fall under.  None of the elements of cause.  None

24   of the conversion or dismissal conversation, or nothing under

25   1112(b)(2), which is the debtors' obligation.  I cannot think

1    of a single reason why this is appropriate or relevant.

2                MR. WILEY:  May I respond, Your Honor?

3                THE COURT:  Sure, go ahead.

4                MR. WILEY:  The bottom line is, Your Honor, an

5    1112(b) motion for conversion is motivated on a creditor

6    filing a legitimate concern about collection of its debt.  If

7    he has evidence that the 1112(b) motion and the show cause

8    order, which the Court issued independent of the 1112(b)

9    motion -- the Court's 1211 -- the Court's show cause order

10   was independent of the 1112(b) motion and it raised concerns

11   about whether or not the case that -- the ability to

12   prosecute going forward a plan of reorganization in good

13   faith.  And looking at 1112's criteria, the testimony of the

14   expert witness with respect to how this creditor is being

15   motivated to seek conversion assists this Court in making its

16   independent determination, because conversion or dismissal,

17   if the debtor is not a debtor in possession with

18   (indecipherable few words).  And basically the facts that are

19   associated with 1112(b)(4).

20        And I think at the end of the day this Court has

21   elucidated an understanding that this is truly a competitor

22   attempting to steal a company out of the industry, as opposed

23   to a creditor seeking to collect the payment of its debt.

24   And I think that helps the Court make a decision whether or

25   not conversion to Chapter 7 as opposed to Chapter 11, which

1  is an option available to the Court if we're able decide to

2  opt out of Subchapter V.  An 11 conversion makes a lot more

3  sense to this competitive environment.  Because if we did not

4  have competitors trying to get us out of the business, the

5  industry, we would not be here today.  That's our problem,

6  Your Honor.

7          THE COURT:  Okay.  Well, a few things and then

8  we're going to take a break because it's lunch time, at least

9  in my Time Zone.

10      At the beginning of this hearing on Wednesday what I

11 said was we're here on three things; a status conference

12 regarding the plan, which we haven't really needed to do

13 anything about because that is contingent on the outcome of

14 the hearings regarding conversion, okay.  I also said, with

15 respect to the Court's order to show cause, that I prefer not

16 to be the prosecutor on these matters.  And so rather than

17 proceeding on the Court's show cause, what we would do is we

18 would proceed on the joint motion to convert that was filed

19 by the creditors.

20      Mr. Wiley, several times you have said that these

21 people are not creditors.  I can go look at the claims

22 register in this case and see that they filed proofs of

23 claim.  PlantSnap filed a claim for $2,565,205.48.  DEJ filed

24 one for $1.5 million.  And HI Investments filed one for

25 $1,248,000.  Those aren't the only claims, but they're pretty

1  big.  There's no objections to those claims.  The plan

2  references objecting to claims and having claim estimation

3  hearings at or before confirmation.  None of that has been

4  filed yet.  So at least according to my rudimentary

5  understanding of the way that the bankruptcy system works,

6  this means that they have claims that are to be treated as

7  allowable, unless there's a ruling to the contrary, okay.  So

8  they can file an 1112(b) motion.  They can raise these

9  issues.  And that's what we're here doing, okay.  And that's

10  what we're here about.

11       And they didn't put on any witnesses because they're

12  standing on their Exhibits 1 through 77, okay, which I have

13  looked at.  And because of the way that the rules work,

14  that's their right.  And you didn't object.  And you

15  obviously have the right on behalf of the debtors to come and

16  put on a rebuttal case, which is what we're here about, okay,

17  to hear evidence from your clients to rebut the allegations

18  that were in, the presentation that Mr. Akers and Ms.

19  Sax-Bolder gave, and their Exhibits 1 through 77.  None of

20  which, okay, have to do with the general state of the plant

21  and animal identification market for apps and computer

22  programs and technology.  None of it was about that.  We're

23  not here about that.  We're not here about whether or not the

24  marketplace is fair.  That's probably outside what I have the

25  authority to decide about, okay.

1          What we're here about is whether or not your clients,

2     the debtors, have complied with the rules that every bankrupt

3     debtor is subject to for transparency, for compliance with

4     filing requirements, for proposing a plan that has some hope

5     of feasibility, okay.  So maybe, maybe that marketplace idea

6     could be relevant regarding that.  But that's not why you're

7     bringing it up.  You just said you're bringing it up because,

8     as I understood it, effectively your argument is these

9     creditors shouldn't have the ability to have filed an 1112(b)

10    motion in the first place, because they're not creditors and

11    they're not playing fair.

12         Well, that's not how this works.  They're creditors.

13    They filed claims.  You may not agree with them, your client

14    may think they're shady, I don't know.  But they get the

15    opportunity to come and raise these issues and to have them

16    get decided.  And so your client -- this is the opportunity

17    of them to address those issues, okay.

18         And on top of that, Ms. Sax-Bolder is right.

19    Technically I'm being really understanding and nice by

20    hearing all of this evidence because -- and by holding the

21    movants to their burden of proof, because no response was

22    even filed to this motion.

23         So I'm going to take a lunch break, okay.  Maybe

24    there's some other reason that we would need to hear

25    testimony from an expert about whether or not the marketplace

1  for this type of technological innovation is fair or not.

2  But that seems to me well outside the scope of what we're

3  actually here about.  So with that, we will reconvene at

4  1:00.

5              MR. RALLS:  Your Honor, can I ask a question?

6              THE COURT:  No, sir, you can't.  You need to

7  talk to your lawyer.

8              MR. RALLS:  Okay.

9                  (Lunch recess ensued.)

10             COURTROOM DEPUTY:  Hi.  Good afternoon.  We're

11 back on the record in EarthSnap, case 24-60363, Chapter 11

12 Subchapter V.

13             THE COURT:  Good afternoon.  We're back on the

14 record in the EarthSnap and Mr. Ralls matters.  I think where

15 we left is you all were -- not you all, you, Mr. Riley --

16 Mr. Wiley, I apologize, were wanting to call a witness, an

17 expert witness to testify about the competitiveness in the

18 marketplace between the creditors, I guess, and the debtor.

19 And I didn't really give you all a ruling about that.  My

20 understanding was it wasn't you who were actually going to

21 call him any way.  It was the attorney for another entity,

22 Mr. Melito.

23      And so tell me where we are.  Is this still something

24 that we're wanting to do?

25      Oh, I apologize.  I didn't realize you all couldn't see

1  me.  And, Mr. Wiley, I think you're muted.  I saw your mouth

2  moving, but I couldn't hear you.  I'm sorry.

3              MR. WILEY:  Yeah.  The scope of the

4  examination was limited to the feasibility of the plan of

5  reorganization as opposed to the competitiveness issue.  I

6  did -- I did argue incorrectly that the testimony was

7  elicited for the competitiveness situation.  But that's

8  really not where the scope of the examination would be.  It's

9  based upon Mr. Ralls -- you've allowed his testimony and

10  Exhibit -- Debtor's Exhibit 16 with respect to the

11  projections of financial results from the industry,

12  competitiveness issues.  And their expert, Mr.

13  (indecipherable name), basically confirmed that there is an

14  industry that's been created by primarily Mr. Ralls and his

15  developing intellectual property that has been the benefit of

16  both PlantSnap, as (indecipherable word), and EarthSnap as a

17  party, and Earth.com as an affiliate that's supporting the

18  plan.

19          And so the testimony is going to be narrow to is there

20  a realistic result from Mr. Ralls' projections from the

21  existing industry as it exists today?  And can Mr. Ralls'

22  results be anticipated to occur in the future?  Not going

23  towards competitiveness issues at all.  I made that mistake

24  arguing that point as -- and I forgot that I'd not objected

25  to the 1112 motions in the first place.  This goes to

1    rehabilitation as opposed to directly attacking the 1112

2    motions.

3                    THE COURT:  Okay.  Is -- is this expert, is it

4    Mr. Ralls, or is it a different person?

5                    MR. WILEY:  No.  It's Mr. John Brandley.

6                    THE COURT:  I'm sorry, tell --

7                    MR. WILEY:  I would call him but Mr. -- the

8    attorney for the EarthSnap or Earth.com would be the

9    examining attorney, Mike, Michael Melito.

10                   MR. MELITO:  And, Your Honor, I think

11   Mr. Wiley misspoke.  I'm the attorney for Greenmind.

12                   MR. WILEY:  Yeah, Greenmind, Greenmind.

13                   MR. AKERS:  Your Honor, we're going to object

14   to Mr. Melito.

15                   THE COURT:  Just a sec.  I know you object.

16   Just a sec.

17        Oh, I see.  This is -- John Brandley, this is the

18   person?

19                   MR. WILEY:  Yes, Your Honor.

20                   THE COURT:  Okay.  And tell -- well, first

21   off, Mr. Melito, I'm not -- you're not here on behalf of the

22   debtor and so I'm not going to let you ask questions of this

23   person, okay.

24                   MR. MELITO:  I understand, Your Honor.

25                   THE COURT:  Okay.  And so if anybody's asking

1  questions, it's going to be the debtors' lawyer, which is not

2  you.

3      And so tell me again, Mr. Wiley, why I need to hear

4  from this person.  What he has to say that's different than

5  what Mr. Ralls has already told us about.

6          MR. WILEY:  Well, he's going to substantiate

7  Mr. Ralls' testimony with respect to the ability and vibrancy

8  of the industry of these applications generating revenue.

9  And so he needs to testify just to essentially confirm and

10 corroborate that the industry does exist and it does have the

11 ability to generate the revenues that Mr. Ralls has testified

12 to.  And confirm that the position that the movants have

13 taken that there is no -- the plan is dead on arrival is not

14 consistent with the facts.

15         THE COURT:  Okay.  Mr. Akers, are you all

16 contesting that there is an industry for computer programs

17 and applications that can identify plants and animals?

18         COURTROOM DEPUTY:  You're on mute.

19         MR. AKERS:  Your Honor, we do not dispute

20 there's an industry.

21         THE COURT:  Do you dispute that there is money

22 to be made in this industry that I think we all agree exists?

23         MR. AKERS:  No, we do not, Your Honor.

24         THE COURT:  So is what you're actually

25 contesting, not the existence of the industry or its

1  potential for profit and success, but rather the mechanics, I

2  guess is the right word, of the plan as proposed to take

3  advantage of that industry and its opportunities?

4           MR. AKERS:  Your Honor, I apologize.  You

5  broke up a little bit on my end.  But if I was tracking, we

6  do challenge the debtors' ability to consummate the plan.

7           THE COURT:  Okay.  So then, Mr. Wiley, I don't

8  think I need to hear evidence about the existence of an

9  industry, the fact that it's an industry in which

10  opportunities exist, because they're not contesting that.

11  All that we're here about is the plan itself.  And so I don't

12  understand what this tech expert has to tell me about the

13  plan that your client proposed, since it's Mr. Ralls who

14  signed it, not this Mr. Brandley guy.

15           MR. MITCHELL:  Your Honor, can I -- can I be

16  heard on this issue?  I know it's a little bit unusual, our

17  status.  And I apologize for my voice.

18           THE COURT:  Well, first off you've got to tell

19  us who you are for the record.

20           MR. MITCHELL:  Sorry.  Thank you, Your Honor.

21  Greg Mitchell.  I'm here for -- as prospective debtors'

22  counsel.  And to kind of explain, you know, we were -- we

23  were discussing this last week prior to the last week's

24  hearing.  And because I was going to be out of town and not

25  going to be available, it didn't make sense to kind of muddle

```
 1  things up by filing an employment application.  But we do

 2  have every intention of immediately seeking to be employed.

 3  We also didn't think it made sense to file an employment

 4  application in the middle of a hearing.  But, like I said, we

 5  do plan to immediately seek to be employed.  And to the

 6  extent I could be heard briefly on this issue, it would be

 7  appreciated.

 8              THE COURT:  Okay.  What have you got to say?

 9              MR. MITCHELL:  Well, what I would throw out

10  regarding the testimony of the -- I believe we do want to

11  briefly address the competitiveness issue.  And the reason

12  that I think the competitiveness issue is relevant relates to

13  the standard that the creditors have to meet.  The standard

14  of 1112(b) specifically references what is in the best

15  interest of the creditors and the estate.  And the debtors'

16  argument is that conversion is only in the best interest of

17  these creditors.  That it's not in the best interest of the

18  estate and not in the best interest of all creditors.  And we

19  think that the competitiveness issue gets at that -- at that

20  point.  It kind of brings into focus the whole basis for

21  bringing the motion.  You know, they could have had some

22  money, but they want the debtor out of business not for

23  anybody but themselves.

24      So the narrow issue that the expert testimony could

25  provide along that line would be simply to confirm that these
```

1    are direct competitors, which I do think sheds light on the

2    standard that these movants have to meet.

3                    MS. SAX-BOLDER:  Your Honor, if I could also

4    be heard on this point, I would appreciate it.

5                    THE COURT:  Yeah, go ahead.

6                    MS. SAX-BOLDER:  Yeah.  I think most

7    fundamentally we have a Rule 26(f)(2)(A) issue.  There is a

8    witness and exhibit list filed at Docket Number 117 in the

9    case that lists John Brandley tech expert resume.  There is

10   multiple versions of some type of written report that I do

11   not believe -- I don't even know if that is what is

12    Mr. Brandley's report that's going to be used here.  It's

13   not clear.  I don't believe that it's signed.  I don't

14   believe that it's necessarily tied to him.  It's not

15   necessarily tied to Mr. Ralls.  I don't know if that's the

16   report.

17         But in any event, there was no disclosure made to the

18   movants here as to what this witness would testify to.  There

19   was no way for us to prepare for this testimony.  I don't

20   believe it's being used as rebuttal testimony.  It's very

21   clear here it's being used to establish something that is

22   outside of the grounds of what was previously put on by

23   Mr. Akers and me in our examination, cross-examination of

24    Mr. Ralls.  I'm really struggling to see how this was

25   properly provided to us.

```
 1          And there is case law I don't have in front of me that
 2   prevents surprise expert reports and surprise expert
 3   testimony from being permitted at trial when there's a
 4   disadvantage to other parties.  And I believe that is what is
 5   happening here.  So whether or not it's relevant and needed
 6   to be disclosed, the nature of it needed to be disclosed, we
 7   don't know if he's being paid.  There's so many other issues.
 8   I just don't think it should be allowed at this stage in this
 9   hearing.
10               MR. MITCHELL:  May I respond, Your Honor?
11               THE COURT:  What was the rule you said,
12   Ms. Sax-Bolder?
13               MS. SAX-BOLDER:  I believe it's 26(f)(2)(B),
14   or (2)(C).  I don't know if this -- you know, there was a
15   written report filed on Friday.  I don't know if that's being
16   tied to this witness.
17               THE COURT:  Just give me one sec.
18          Okay.  Is this person, is he being paid by the debtor
19   for his testimony?
20               MR. WILEY:  No, Your Honor.
21               THE COURT:  I'm sorry?
22               MR. WILEY:  No, Your Honor.
23               THE COURT:  Is there a written report?
24               MR. WILEY:  Yes.  And it has been filed with
25   the opposing counsel.  They've had it four days.
```

```
 1                THE COURT:  Okay.  When you say it's been
 2   filed, what of your exhibit numbers is it?
 3                MR. WILEY:  Exhibit 16, as I recall,
 4   (inaudible few words).
 5                MS. SAX-BOLDER:  Sorry, I couldn't hear.
 6                THE COURT:  You said it's Exhibit 16.
 7                MR. WILEY:  And also Exhibit 11.
 8                THE COURT:  Okay.  Well here's the deal.
 9   Exhibit 16 was attached as a supplement to the witness and
10   exhibit list.  It was not timely filed.  It was filed one day
11   before the hearing got started.  Well, let me make sure that
12   that's right.  Yes.  It was filed on Tuesday, March 18th
13   before the hearing on Wednesday, March 19th.  And that makes
14   under our local Rule 9014 and 7016 the deadline to disclose
15   that no later than Friday, March 14th.  So it was late.  And
16   so we're not going to admit any late reports.  I've already
17   let you admit one late thing.
18        And, furthermore, I don't understand how this is
19   relevant to what we're here about.  And I don't understand
20   how it is within the scope of what we have already heard
21   testimony about.  What we heard testimony about is did the --
22   has the debtor complied or not with the various
23   administrative rules.  This has nothing to do with that.
24   Has -- have we been transparent in our operating reports?
25   Have those reports been timely filed?  Was an account opened
```

1  when it was supposed to be?  This does not have anything to

2  do with that.  You know, does it perhaps relate to whether or

3  not there is a likelihood of rehabilitation or

4  reorganization?  Yes.  But is this the competitiveness within

5  the scope of the market, is that within the zone of what we

6  heard about before, even from Mr. Ralls?  Not really, no.

7  And so I'm not going to hear this.

8         At some point there are rules and there are procedures

9  and there are deadlines and they have to be observed.  You

10 all have had many, many, many chances.  Again, the fact that

11 I'm letting you all contest this is a chance, because no

12 response has been filed.  So on some sense Mr. Akers and

13 Ms. Sax-Bolder had no idea what you all were going to show up

14 and say, because there was no objection.  So, no, I'm not

15 going to let you do this.  I'm not going to hear this.  It

16 was filed late.  It's not within the scope of what we're here

17 about.  And it's not relevant.  So, no.  We're not going to

18 hear from this person.

19        Is there anyone else that we would like to call?

20              MR. WILEY:  No, Your Honor.

21              THE COURT:  Okay.  Okay.  Well, then I guess

22 we're ready for closing arguments.

23              MR. WILEY:  Yes, we are.

24              THE COURT:  So why don't we --

25              MR. WILEY:  Your Honor, the --

```
 1                THE COURT:  Well, wait, Mr. Wiley.  It's not
 2   your motion.  It's either Mr. Akers or Ms. Sax-Bolder's
 3   motion, so they get to go first.
 4                MR. AKERS:  Thank you, Your Honor.  I'll start
 5   this and I believe Ms. Sax-Bolder may have comments
 6   afterwards.
 7        Your Honor, these cases must be converted.  Under
 8   Section 1112(b) the Court shall convert a case for cause.
 9   Here there are 12 instances of cause to convert this case.
10   And the movants need only prove one.
11        First under Section 1112(b)(4)(A) there's a continuing
12   loss to and diminution of EarthSnap's estate and an absence
13   of a reasonable likelihood of rehabilitation.  EarthSnap has
14   had months after months of losses since its petition date.
15   That's evidenced on its monthly operating reports at Movant's
16   Exhibits 8 through 10, 12 through 13, and 22 through 23.
17        Second, there is an absence of a reasonable likelihood
18   of rehabilitation.  The debtors' proposed plan of
19   reorganization is solely dependent on Earth.com paying off
20   its debts.  But that plan is deeply flawed.  Even if we look
21   at the projections that the debtor discussed today and that
22   it intends to put forward in any amended or subsequent plan
23   of reorganization, it is still flawed.  The debtors did not
24   identify the cost of operating the Earth.com domain, which
25   Mr. Ralls testified it does not own and that the owner could
```

1   shut off at any given moment.

2       The debtors did not include any of Earth.com's

3   short-term liabilities, such as the payment of tax

4   liabilities.  And the debtors do not adequately address

5   Earth.com's long-term debts, which Ralls testified are more

6   than $5.5 million.  And that number aligns with what the

7   Earth.com put forward in its previous bankruptcy case

8   evidence at Debtors' -- or Movant's Exhibit 72.

9       Moreover, PlantSnap and DEJP have a recorded judgment

10  against Earth.com, which is not in bankruptcy.  And nothing

11  is preventing Earth.com from being subject to garnishments

12  and levies, which would thus disrupt the very cash flow that

13  the debtors rely on to propose any plan.

14      Second, under Section 1112(b)(4)(B) the debtors have

15  grossly mismanaged their estate.  Here there are six examples

16  of gross mismanagement.  First Mr. Ralls testified to rampant

17  commingling between the debtors and non-debtor affiliated

18  entities.  This is shown on all of EarthSnap's monthly

19  operating reports, with a great example which is at Movant's

20  Exhibit 9.

21      Second, the debtors have failed to properly report

22  income and expenses on their monthly operating reports.  The

23  EarthSnap monthly operating report amounts to nothing more

24  than EarthSnap attaching a bank statement, which is in direct

25  violation of Form 425(c) that every Subchapter V debtor needs

1  to put forward.  The debtor provides no explanation for any

2  of these transactions, either as a cash disbursement or

3  reimbursement.

4       All those monthly operating reports, which are at

5  Movant's Exhibits 32 through 35 are wholly deficient.  Until

6  January of 2025, Mr. Ralls stated he had no receipts or

7  disbursements.  And didn't even attach a bank statement.  But

8  last Wednesday Mr. Ralls testified that he made more than

9  zero dollars, making each and every monthly operating report

10  inaccurate.

11       Third, it has taken the debtors more than six months to

12  obtain a DIP account.  And even then Mr. Ralls doesn't even

13  use the DIP account.  Instead using Greenmind's account to

14  pay all of his personal expenses, which is based on

15  Mr. Ralls' testimony and Movant's Exhibits 35 and 86.

16       Fourth, all of the post-petition transfers between the

17  debtor and non-debtor affiliated entities are either

18  unauthorized loans under Section 364, or avoidable

19  post-petition transfers under Section 549.  In either event,

20  the transfers are against the Bankruptcy Code.

21       Fifth, the debtors retained Pilot Accounting without

22  Court approval.  During Wednesday's hearing the debtor has

23  attempted to characterize Pilot Accounting as merely a

24  bookkeeper to avoid the obligations under Section 327.  But

25  during the December 19th hearing, Mr. Ralls made clear it was

1  an accounting firm to handle, quote, both bookkeeping and

2  accounting, end quote.

3      Sixth, the debtors paid unapproved fees to Mr. Wiley in

4  violation of Section 330 as shown on Movant's Exhibit 9.  And

5  when asked about this today, three things came out.  One,

6  this was a reimbursement which is subject to Section 330.

7  That reimbursement was obtained by a debtor, EarthSnap, as

8  shown at Movant's Exhibit 9.  And, third, it was used to

9  create a third-party entity that EarthSnap and Earth.com

10  would shuffle money to so that Mr. Ralls could use that

11  account as his personal bank account.  Here there are six

12  more instances of cause bringing the total to seven.

13      Eight, EarthSnap has still failed to comply with the

14  Court's discovery orders.  Therefore, violating Section

15  1112(b)(4)(E).  EarthSnap's monthly operating reports show

16  transfers in and out of its bank account using Paypal and

17  Zelle.  But when asked to produce these statements in

18  connection with discovery, the debtor said it had no

19  third-party platform bank statements.  And it did not provide

20  any of those statements.

21      The debtors have argued that PlantSnap and HI

22  Investments never pressed this issue.  And that is so far

23  from the truth, as both of us have filed two motions to get

24  this information culminating in the February hearing and the

25  Court's show cause order.

1      Ninth, the debtors have failed to timely file most of

2  their monthly operating reports.  And Mr. Ralls has failed to

3  file any report for September and December of 2024.  And I'd

4  like to point out since Wednesday, nothing has been

5  corrected.  The debtor has taken no steps to cure what is

6  easily an administrative issue.  And, incredibly, the debtor

7  has not filed its February monthly operating reports, which

8  were due last Friday.  And there's no excuse for this,

9  because in Debtors' Exhibit 4 Mr. Ralls makes clear that he

10  understands the 20th of the month is when these need to be

11  filed.

12      Tenth, the debtors have failed to comply with Section

13  1116, which requires Subchapter V debtors to attach their

14  financial and tax statements.  Although Mr. Ralls testified

15  that he hired Pilot to create the financials, Mr. Ralls has

16  still not retained an accountant to address the tax issues.

17      Eleventh, the debtors' plan at Movant's Exhibit 14 is

18  facially unconfirmable under Section 11 (unknown amount of

19  words missing due to audio going out).  The debtors have not

20  complied with the Bankruptcy Code as previously stated.

21            COURTROOM DEPUTY:  Mr. Akers --

22            THE COURT:  Mr. Akers --

23            MR.  AKERS:  Mr. Ralls has not --

24            THE COURT:  -- you froze after the words, plan

25  is patently unconfirmable.

```
 1              MR. AKERS:  I apologize, Your Honor.

 2              THE COURT:  It's okay.

 3              MR. AKERS:  That plan is facially

 4  unconfirmable under Section 1129(a)(1), (2), (4), (5), (7),

 5  (8) and (10).  The debtor have not complied with the

 6  Bankruptcy Code as previously stated.  Mr. Ralls has not

 7  disclosed his compensation.  The only impaired class under

 8  that plan has rejected the plan.  And the debtors did not

 9  provide a liquidation analysis.  Furthermore, the projections

10  attached to that plan are a sham.  As Mr. Ralls testified, he

11  had no idea what they were.

12          Twelve, this is a bad faith filing.  Mr. Ralls and his

13  affiliated entities have been in and out of bankruptcy five

14  times in less than two years.  As the Colorado Bankruptcy

15  Code -- Court noted at Movant's Exhibit 66, Mr. Ralls filed

16  the first bankruptcy case to avoid a state court trial

17  against PlantSnap and DEJP.  Mr. Ralls filed a second

18  bankruptcy case to prevent PlantSnap and DEJP from

19  foreclosing on his shares in Digital Earth Media, which

20  controls the entire enterprise.  More specifically, it allows

21  Mr. Ralls to stay in place at Earth.com which generates all

22  of the profit and which allows Mr. Ralls to transfer those

23  profits to Greenmind, which was established by Mr. Ralls.

24          Greenmind is an entity that was created in bankruptcy

25  to shield Earth.com's cash from its creditors as stated in
```

1   his plan at Movant's Exhibit 14.  And its (indecipherable
2   word) he used to pay his expenses outside of the purview of
3   his creditors and this Court.  Mr. Ralls does not deny the
4   debtors' failure to abide by the Bankruptcy Code, having
5   acknowledged repeatedly administrative issues along the way.
6   Instead he makes a litany of excuses, none of which can
7   overcome a finding of cause.
8        First, he argue the claim's not important.  However, as
9   stated by the Middle District of Florida, honesty and
10  disclosure are essential cornerstones of the bankruptcy
11  process.  Second, Mr. Ralls claims PlantSnap and EarthSnap
12  are competitors.  And that PlantSnap and DEJP somehow acted
13  improperly over the last four years.  However, he fails to
14  explain why any of this is relevant.  And at the end of the
15  day PlantSnap and DEJP, along with HI Investments are
16  creditors of both plans that propose Mr. Ralls as a secured
17  creditor and EarthSnap as an unsecured creditor.
18       Third, Mr. Ralls blames his attorney for his failures.
19  While movants are sympathetic to Mr. Wiley's circumstances,
20  Mr. Wiley's troubles did not occur until later last year.
21  And it cannot explain why Mr. Ralls has yet to file a
22  September monthly operating report, as well as any of the
23  other early failures.  And more importantly, Mr. Wiley is not
24  responsible for the rampant commingling.  That -- that lies
25  solely on Mr. Ralls.

1          Fourth, Mr. Ralls claims complete ignorance when it

2     comes to documents he submitted under penalty of perjury.

3     Again, these are the fourth and fifth cases Mr. Ralls has

4     filed individually or on behalf of his entities within the

5     last two years.  And while no one expects absolute perfection

6     when it comes to filing your schedules and statements, what

7     Mr. Ralls submitted throughout this case is grossly

8     inaccurate.

9          Leading up to this bankruptcy Mr. Ralls was engaged in

10    litigation with PlantSnap and DEJP for almost three years.

11    And it is because of those confessions of judgment that got

12    entered is what prompted him to file bankruptcy.  Yet when he

13    filed his schedules and statements, noticeably absent is

14    PlantSnap and DEJP.  And noticeably absent are his SOFA and

15    any mention of the state court.  The monthly operating

16    reports are grossly deficient.

17         Mr. Ralls testified he received more than zero dollars

18    each month.  And yet every one of his monthly operating

19    reports until January of 2025 shows zero dollars in or out.

20    And the debtors' plan of reorganization, which the debtors

21    had more than two years to contemplate and put together when

22    you put these bankruptcy cases together contains just one

23    page of projections which, again, Mr. Ralls has claimed he's

24    not seen or has anything to do with.

25         The movants have established multiple instances of

1  cause.  And because cause has been established, conversion is

2  the appropriate remedy here.

3       The three largest creditors support conversion.  As

4  discussed, there's rampant commingling between the debtors

5  and non-debtor affiliated entities.  These non-debtors

6  apparently control and direct the debtors' funds, as

7  evidenced by Metaversal having access to EarthSnap's Paypal

8  account.  And there is clear evidence of money going in and

9  out of the debtors' accounts.  A Chapter 7 Trustee is best

10  positioned to examine and prosecute these avoidance actions

11  on behalf of the estate and all creditors.

12       And there are significant assets to liquidate.  In

13  addition to these avoidance actions, a Trustee can liquidate

14  EarthSnap's intellectual property, as well as Mr. Ralls'

15  shares in Digital Earth Media.

16       The Court had mentioned a concern about, you know, if

17  these are profitable entities, why throw them into Chapter 7?

18  And what I would say to that is that this is not a typical

19  Chapter 7.  The main asset of the estate is Digital Earth

20  Media's shares.  And those shares represent Mr. Ralls'

21  interest in a going concern.  And it behooves everyone to

22  make sure that those entities are operating efficiently.  And

23  a Chapter 7 Trustee is best positioned to get those shares

24  ready to be sold, which also means exercising the voting

25  rights, whether to (inaudible word), or to someone else, to

1  remove Mr. Ralls, stabilize these entities, and get the value

2  of these companies up to where they need to be.

3      Finally, the debtors are likely to file for bankruptcy.

4  Again, having done so five times in the past two years.  The

5  debtors have used the Bankruptcy Code both as sword and

6  shields.  Availing themselves of every protection of the

7  Bankruptcy Code, notably the automatic stay, without any of

8  the commensurate obligations of transparency and disclosure.

9  And this was done for one purpose, to prevent his secured

10  creditors from taking his shares which would prevent

11  Mr. Ralls from using Earth.com as his personal ATM.

12      This Court should grant the motion to convert the cases

13  to Chapter 7.  Thank you, Your Honor.

14          MS. SAX-BOLDER:  Thank you, Your Honor.  I

15  really don't have much to add to that.

16      You know, I think the testimony over the past two days

17  was clear that Mr. Ralls is abusing the bankruptcy system to

18  use non-debtor entities to hide money from creditors,

19  promising the creditors he'll be profitable enough to pay

20  them back 100 percent in the future, despite the fact that

21  it's clear from the testimony he's stashing the money outside

22  of the bankruptcy case and simultaneously fighting at least

23  three of his largest creditors in non-dischargeability

24  actions.

25      Under these circumstances the creditor of Mr. Ralls, HI

1    Investments, does believe that Chapter 7 is the right step

2    forward here to help untangle the web that Mr. Ralls has

3    woven.  Dismissal of the cases will only allow Mr. Ralls to

4    perpetuate the scheme and effectively bless post-petition

5    transfers that have occurred during the pendency of this case

6    that need to be investigated by an independent party here, a

7    Chapter 7 Trustee.

8         And with that, we would join in the closing arguments

9    that Mr. Akers has already proffered to the Court.

10            THE COURT:  All right.  Thank you.

11        All right, Mr. Wiley.

12            MR. WILEY:  Your Honor, I'll cut to the chase.

13    Two creditors, PlantSnap and HI are here requesting

14    conversion.  The reason for that conversion is based upon the

15    settlement agreement that exists at the binding term sheet

16    that was Exhibit 62 that dealt with the issues associated

17    with what happens when there is a breach of payment of the

18    $2.5 million obligation.  What happened in the event of that

19    breach was that PlantSnap and DEJ have -- individually have

20    judgments that PlantSnap and DEJ would eventually have the

21    opportunity to foreclose their liens upon stock sales in the

22    holding company of Mr. Ralls.  And they would take control of

23    PlantSnap, Earth.com and all the other related affiliates and

24    associated entities.

25        That is what this case is about, two creditors that

1    want to have a liquidation event that results in them getting

2    paid and the other creditors that are part of the case not

3    being paid.  Because Mr. Akers has clear with me in our

4    conversations that it is his intent to bid in his judgment

5    liens created by the consent judgment against the assets that

6    Mr. Ralls has individually in the holding company.  And as a

7    result of his ability to bid in his debt, there would be no

8    money coming to the Trustee among liquidation of that.

9    Rather, there would just be a transfer based upon the liens

10   being perfected by Mr. Akers' client.

11        Now, how this works for HI has been an enigma to me

12   throughout the case.  HI should be standing side by side with

13   Mr. Ralls resisting Mr. Akers' attempt to seize all the

14   assets of EarthSnap and Mr. Ralls.  Because at the end of the

15   day, Ms. Sax-Bolder's client owns 14 percent of the holding

16   company.  Why she feels that it's in the best interest of her

17   client that her 14 percent interest get evaporated and

18   eviscerated by a lien enforcement, I have no clue.  I can

19   only surmise that it's based upon some belief that she

20   benefits from Mr. Akers' client obtaining control.

21   Otherwise, every logical statement in my mind says that she

22   should not be here today opposing us.

23        Be that as it may, the bottom line is that two

24   creditors want to have a conversion.  The ballots that we

25   have received thus far with respect to their claim in this

1  plan of reorganization support the plan.  I can represent

2  that to the Court.  The ballots that have been voted against

3  the plan are HI and PlantSnap and DEJ.  Why not?  Because the

4  plan pays 100 percent to all creditors.  And as a result, the

5  plan has been overwhelmingly approved.  The plan that is

6  being submitted to this Court is a plan that if a Chapter 7

7  Trustee takes over operations and has to deal with lien

8  positions of secured creditors that under the plan do not

9  exist.  Under the plan the executory contract called a

10  binding term sheet, Defendants' Exhibit 53, I recall, it

11  assumes defaults then are cured by payment of past due

12  payments under the $2.5 million installment agreement.  And

13  once the defaults have cured, the judgment liens that existed

14  by the way of the consent judgments go away completely.

15  Because they exist only in the event of a default.  But,

16  frankly if, in fact, this conversion takes place, there is no

17  ability of a Trustee in Chapter 7 to assume the executory

18  contract because there's a liquidating event and there's not

19  a plan of reorganization going forward under (indecipherable

20  word) 1129.  So as a result, the rejection of the executory

21  contract leads to lien enforcement.

22      This case is not that complex.  At the end of the day,

23  the judgment of conversion results in two creditors

24  benefiting, HI through some relationship and understanding

25  with PlantSnap and DEJ, or alternatively, all creditors

1    getting 100 percent return and recovery on their claims.

2         To be sure, this case has been far from perfect on

3    execution of the administrative responsibilities.  This case

4    has been a struggle for my firm and for me ever since we

5    started it in 2024.  I had impaired health and circumstances.

6    I also had an excruciating schedule involving and

7    (indecipherable word) major transactions at the end of my

8    career.  This was 50 years of practice involved that I'm

9    finally winding down.  So, yeah, there were minutiae.

10        Every attempt was made to correct schedules and

11   statements of affairs from a very complicated situation.  Mr.

12   Ralls had no backup financial accounting and bookkeeping

13   operations.  His books and records were in disarray.  They

14   were based upon a previous bankruptcy situation.  The same

15   two creditors that are here for motions for conversion -- not

16   the same two, but at least two of the three were the ones

17   that motivated the initial bankruptcies in Colorado by

18   inundating Mr. Ralls with litigation regarding fraud,

19   fraudulent concealment, fraudulent transfers, and the like.

20   But he could not represent himself pro se under the Court's

21   corporate entity rules that prohibit a pro se litigant.  He's

22   been basically squeezed out of the judicial process by force

23   of (indecipherable word).

24        He lost one company that he invented, PlantSnap, which

25   had a valuation of 20 some odd million dollars to DEJ and

1  PlantSnap and their current ownership.  Now they're coming
2  after the second company.  Even after they've been offered
3  opportunity after opportunity to just be paid the 2.5 million
4  that they agreed to pay -- received in the Colorado
5  settlement.  Instead they raise the Colorado settlement
6  consists of new facts for this Court to consider.  They've
7  just got new problems for this Court to consider.
8        I think a more practical solution than a Chapter 7
9  conversion is a Chapter 11 case where these companies can
10  continue to operate, assume executory contracts,
11  (indecipherable word) these claims associated with the breach
12  of the executory contracts.  And pay off DEJ and pay off
13  PlantSnap the 2.5 million.  Meanwhile, the 14 percent
14  interest represented by the proof of claim of 1.4 million,
15  that creditor, HI has been offered.  Okay, fine.  If you
16  don't want 14 percent of the holding company, accept the $1.4
17  million that you contend to be the value of the investment
18  that was stolen from you as a pay off.  That could be --
19  that's part of the plan of reorganization.  But rather than
20  schedule that, we have a winner take all.  We want to have a
21  clean slate.  We want to have a (indecipherable word) at the
22  table. Mr. Ralls is wiped out completely.  DEJ, PlantSnap,
23  HI go forward together and the other creditors are left with
24  zero.
25        I think this Court has enough discretion under 1112 to

1  decide to do something more practical.  I think 1112

2  conversion to a Chapter 11 Trustee, which we would be willing

3  to accept by allowing ourselves to deny Subchapter V

4  treatment, which is our option.  It makes a lot more sense

5  than wiping the table and giving the business over to

6  PlantSnap, DEJ, and HI.

7        And that's my closing argument today.

8                THE COURT:  All right.  Thank you, Mr. Wiley.

9        All right.  Anything else?

10               MR. MITCHELL:  Your Honor --

11               THE COURT:  Yes.

12               MR. MITCHELL:  -- may I be heard briefly

13 either now or before Ms. Aurzada, if she has anything?

14               THE COURT:  I don't think Ms. Aurzada is with

15 us today, Mr. Mitchell.  But you can -- oh, okay.

16               COURTROOM DEPUTY:  She's on.

17               THE COURT:  Oh, okay.

18               MS. AURZADA:  Judge, this is Areya Aurzada.  I

19 am here.

20               THE COURT:  Okay.  All right.  Then I guess go

21 ahead, Mr. Mitchell.

22               MR. MITCHELL:  Okay.  I will be brief, Your

23 Honor.

24        From everything that I've heard in listening to the

25 audio of last Wednesday's hearing and listening here today, I

1  would suggest that maybe 95 percent of the issues identified

2  by the movants can be explained by the issues related to

3  Mr. Wiley's situation.  And I would suggest, as I've stated,

4  we intend to be employed immediately.  Give us a short leash.

5        What hasn't been referenced specifically is 1112(b)(2),

6  which says that the Court may not convert a case if the Court

7  finds and specifically identifies unusual circumstances

8  establishing that converting or dismissing the case is not in

9  the best interest of creditors in the estate.  I think we

10  have very unusual circumstances given Mr. Wiley's situation.

11  It doesn't necessarily excuse the administrative failures,

12  but it does explain them such that 1112(b)(2) could easily be

13  invoked.  And if we go on to 1112(b)(2)(A) requires that

14  there's a reasonable likelihood a plan will be confirmed.  We

15  believe that's -- we believe that's the case.  There are

16  certainly some -- some clean up of the plan.  But I think

17  there's been testimony that makes clear that there's money to

18  fund a plan.

19        There is -- there is a path forward for everybody to

20  get paid.  I think that's some of the most important

21  testimony.  And that relates to implementation of a plan that

22  pays 100 percent to all creditors.  I don't think we can

23  ignore that.

24        And then 1112(b)(2)(B) says that the grounds for

25  converting to dismissing the case include an act from which

1    there's a reasonable justification.  I think there's a very

2    clear reasonable justification for some of the administrative

3    failures.  And then (B)(ii) says that those failures will be

4    cured within a reasonable period of time fixed by the Court.

5        So again we would ask, give us a very short lease.

6    Mr. Ralls has been honest regarding his weaknesses.  And I

7    think he credibly testified that he relied on others,

8    including his attorneys and his bookkeepers to manage this

9    case and to manage the accounting issues.  And he had some

10   troubles in both areas.  But despite all -- despite all of

11   that, Mr. Ralls has managed to succeed in growing the

12   business.  There may be some unusual structures in place,

13   i.e., the way the debtor is managed by another entity.  I'm

14   having trouble seeing how any of that's wrongful.  Mr. Akers

15   alleges unauthorized loans or fraudulent transfers.  It seems

16   like it's just a management company that's not that different

17   than saying employee leasing operations that handles

18   employees.  I think it perhaps should be employed.  And

19   that's something that could be addressed fairly quickly.  I

20   don't think it's improper.  All of it's been disclosed.  And

21   they could and did ask questions about it.

22       And, indeed, they're the ones that have the exhibits.

23   I'm not aware of any need to subpoena the exhibits that they

24   used to show that money was being paid to a management

25   company.  But, again, I think that a short leash, given

1  1112(B)(2)'s provisions would allow us to clean up most of

2  that.  It seems reasonable that a debtor should get the

3  chance to perform on 100 percent plan, because there are some

4  clear ulterior motives behind the attempts to have the case

5  converted.

6      At the hearing last Wednesday Mr. Akers tried to

7  challenge Mr. Ralls' assertions that they intended to take

8  over his business.  But I think Mr. Ralls did a very credible

9  job of pointing to provisions in that settlement agreement

10 that make clear that's exactly what they intend to do.  And

11 then Mr. Thomas tried to paint this picture of Mr. Ralls

12 creating a separate company in the form of Greenmind to avoid

13 the claims of movants by sending money to a third party.  But

14 Mr. Ralls, again, credibly testified that he was sending

15 money to an entity that was managing entities that movants do

16 have a claim against.  So going back to the fact that debtors

17 have expressed their intent to confirm a plan that pays

18 creditors 100 percent, I would once again suggest they should

19 be given the opportunity to do that.

20     As to that arrangement, you know, I would further point

21 out that the use of Greenmind over Metaversal is hardly any

22 sort of classic fraudulent transfer, because Metaversal was

23 also a third-party management company.  So just like

24 Greenmind, Metaversal is not the entity that earned the

25 money.  It was just used as a tool to manage other companies.

1    So by not using Metaversal, it's not like the debtors

2    funneled money away from the entity that had the entitlement.

3    Instead they just funneled money to an entity exactly like

4    Metaversal.  And that's unlike abusive situations that, at

5    least that I've seen where a debtor's trying to funnel money

6    out of the estate to avoid creditors.  Here there's money

7    being funneled to an entity to deal with creditors.  Just

8    perhaps not deal with them in the way that these movants

9    would have them do within -- by, I suppose, just allowing

10   them to simply garnish funds to the detriment of other

11   creditors.

12       And then Mr. Thomas also tried to make much about the

13   fact that Greenmind was paying Mr. Ralls' personal expenses.

14   But he had readily admitted to that well before that

15   cross-examination, so he wasn't really covering new

16   territory.  And I think that's the reason you have

17   accountants and management companies.  Mr. Ralls is by no

18   means the first person who has accounting people to help

19   properly classify transactions that are business versus

20   personal.  That's not necessarily to say that's the best way

21   to handle it.  But that happens all the time.

22       Ms. Sax-Bolder yesterday asked Mr. Ralls a specific

23   question at the initial hearing about what transactions he

24   would be required to go in and classify.  And his response

25   was that he would need to identify those transactions that

1  were personal in nature.  So I think that was being addressed

2  by the management company and by -- and by the accountants.

3       Your Honor, I would -- I would kind of piggy bank off

4  of Mr. Wiley's suggestion.  While I don't believe conversion

5  is appropriate, and I also don't believe necessarily that

6  having a Chapter 11 Trustee is the -- is the best option, to

7  the extent the Court were inclined to convert we would

8  request, number one, that the Court give us, again, a short

9  leash to right the ship.  Maybe no more than 30 days.  We

10 come back at a status conference.  If the Court is not

11 satisfied with progress, then the case can either be

12 converted at that time or perhaps at that time the Court can

13 give an even smaller window for the debtor to get a motion on

14 file to un-elect Subchapter V and seek the appointment of a

15 Chapter 11 Trustee.

16      When I was listening to the audio of last week's

17 hearing before the Court asked a question about a Chapter 11

18 Trustee, I too had forgotten that this was a Subchapter V

19 case.  And I had already made note to myself to consider

20 that.  Mr. Akers referenced the desire to have neutral party

21 in the from of a Chapter 7 Trustee.  If that were truly the

22 case, they shouldn't have a problem with a Chapter 11 Trustee

23 who is also neutral.  But I suspect they will object to the

24 appointment of a Chapter 11 Trustee because that obstructs

25 the true motive behind seeking conversion, which is to put a

1  competitor out of business.  Putting competitors out of
2  business is not what Chapter 11 should be about.  And I would
3  respectfully suggest that if the real motive is just having a
4  neutral party running the debtor, then a Chapter 11 Trustee
5  could address that issue.
6      Your Honor, I would just simply conclude that I think
7  it's clear that these movants don't really have an interest
8  in what's best for the estate and for all of the creditors.
9  And they only have an interest in what's best for these
10 creditors.  Sometimes what's best for a few creditors could
11 be best for all creditors.  I don't think it is so in this
12 case.  Here debtors' plan would pay all creditors 100 percent
13 and they would continue to operate.  I think that's what's
14 best for the estate and all the creditors.
15     So, again, we would -- we would ask that the Court give
16 us, at the very least, a very short leash to right this ship
17 and get a -- get a plan confirmed that pays 100 percent.
18     And that's all I have.
19         THE COURT:  All right.  Anything final,
20 Mr. Akers or Ms. Sax-Bolder?
21         MR. AKERS:  Yes, Your Honor.  I guess the only
22 thing I would add is I agree with Mr. Wiley.  This case is
23 just not that complex.  Now, we have been (indecipherable
24 amount of words missing due to audio cutting out) in Chapter
25 11 now since June.  And this is the second go around in two

1  years we have done.  This competitive thing, there's nothing
2  (inaudible word) for that.  My client disputes that.  And I
3  know it's he said/she said.  But at the end of the day, this
4  is a Subchapter V.  The choices are conversion and dismissal.
5  And dismissal, we have been there before after the first
6  bankruptcy case.  We've seen what this looks like.  And it
7  will end (indecipherable amount of words missing due to audio
8  skipping), which means conversion is the best choice here.
9  Appoint a neutral party and they can sell the shares.  Those
10 shares are a going concern.  This is not a shut down this
11 company.  The good this company can do for the world, that's
12 still a complaint.  We're not harming them.
13      And so at this point between the two options, conversion
14 truly is in the best interest of the creditors and the
15 estate.  Because at the end of the day, the shares Mr. Ralls
16 believes are worth an incredible amount more than what DEJP
17 and PlantSnap is entitled to.  Which means all of that would
18 spill over to the unsecured creditors.  DEJP and PlantSnap do
19 not have a secured interest in anything else, the avoidance
20 actions or (indecipherable two words), which means all of
21 this truly will be done for the estate and for all of the
22 creditors.
23              THE COURT:  All right.  Ms. Aurzada.
24              MS. SAX-BOLDER:  Thank you, Your Honor.
25              THE COURT:  Oh, I'm sorry, Ms. Sax-Bolder, go

1  ahead.

2              MS. SAX-BOLDER:  No and I'll be very brief.

3       I think that in some circumstances it is appropriate to

4  give a debtor multiple chances.  But here Mr. Ralls has had

5  enough chances already.  We have been in this case since

6  August.  My client did not pursue the motion to convert

7  earlier, neither did Mr. Akers' client.  We did sit back and

8  we waited.  And we've been raising these issues.  We've been

9  in front of Your Honor on motions to compel information.  All

10  of that information should have been provided in monthly

11  operating reports, or at least most of that information.  The

12  information that we were wanting is, where is the money?  How

13  is it being spent?  Where is it going?  And still sitting

14  here today, I don't have good answers on that.

15       So the notion that this would get fixed in 30 days, I

16  don't -- I don't really think that that's a fair thing to do

17  at this point for creditors who have been sitting around

18  waiting for these answers for months.  Three lawyers showed

19  up today, presumably to represent Mr. Ralls, but nothing has

20  happened since last Wednesday.  If this were really

21  important, operating reports could have been filed.  At least

22  some additional information on those Paypal accounts could be

23  provided.  Nothing's been provided.  So to sit here and wait

24  for probably the worst schedules and statements I've ever

25  seen filed in a court and monthly operating reports that show

1    zero dollars, questioning whether or not this actually is

2    just administratively insolvent to begin with, I think just

3    to sit here and wait for another 30 days while maybe

4    something happens is not justified at this point.  We've been

5    waiting for a long time.

6         And Mr. Akers and I, you know, we represent our clients.

7    I think there's been a lot of allegations today about what

8    I've decided to do in this case, or what Mr. Akers has

9    decided to do in this case.  But my client makes the

10   decisions here.  And my client is not necessarily aligned

11   economically with Mr. Akers' client.  I think you heard that

12   from Mr. Wiley.  Where we are aligned is that this sham has

13   gone on for too long without a third party involved to

14   investigate and unwind the scheme and provide any

15   distributions to creditors.

16        Mr. Ralls testified, I can pay everyone back 100

17   percent.  Those were his words.  I'm doing really well.  When

18   people are off my back, I'm profitable.  Those are the things

19   that you heard today.  Mr. Ralls and my client are both

20   equity and trust holders in DEM the parent company.  While

21   Mr. Ralls may be very profitable on his 86 percent shares in

22   DEM, my client's gotten zero dollars, nothing.  And so to sit

23   here and question my clients motives as a competitor I think

24   ignores a fundamental flaw in the argument, which is that if

25   Mr. Ralls is so profitable, where's the money going?  Why is

1   it not going to creditors?  And when he testified earlier in

2   the week last week, he's the one who's calling all the shots.

3   So to say that 95 percent of the issues here are addressed to

4   his lawyers and communication issues between him and his

5   lawyers ignores the very fundamental issue, which is that

6   Mr. Ralls is at the helm of this all and he has no

7   guardrails, no control, and no reporting, seemingly no

8   reporting that he's providing to creditors about it all.

9       So I think at this point no more time is necessary

10  here.  I think enough time's been given.  And my client would

11  be opposed to conversion to Chapter 11 to put a Chapter 11

12  Trustee in place when a Chapter 7 Trustee could do it at this

13  point.

14         THE COURT:  All right.  Ms. Aurzada.

15         MS. AURZADA:  Good afternoon, Judge.  Areya

16  Holder-Aurzada, Subchapter V Trustee.

17       These are tough cases.  I have been concerned about

18  these cases from the beginning.  The schedules that I saw

19  very early on in the case are gross -- or were, arguably are

20  still incomplete, but definitely were grossly inaccurate.

21  And that was the first red flag for me in these cases.  The

22  operating reports are very troubling, as well.

23       There has been, you know, a lot of testimony that was

24  elicited last week from Mr. Ralls where he described some of

25  the transfers.  As a Trustee those concern me, looking at the

1  bank statements that we have.  So we have operating reports

2  that show money going in and out.  I understand

3  Mr. Mitchell's argument that that's a management company.

4  But, again, because we don't have what appears to be accurate

5  operating reports, it's really hard to determine what's going

6  on here.  And this late in the game, we should know that.

7       And so, you know, I appreciate that Mr. Wiley is

8  offering to un-elect Subchapter V and put in a Chapter 11

9  Trustee.  But that doesn't -- I'm not sure how that works,

10  you know, in the middle of a hearing.  I don't know if that

11  can be done in the middle of a hearing because we don't have

12  a motion on file.  I suppose they could make an oral motion.

13  But it does seem that we are at the stage in these cases

14  where something needs to be done one way or the other.  We

15  either need to convert to Chapter 7, or we need to have a

16  Chapter 11 Trustee in place.  But I don't think Mr. Ralls

17  should remain at the helm of the debtor in possession in

18  either of the two cases.

19       Thank you, Your Honor.

20            THE COURT:  All right.  Thank you.

21       All right.  Well, you all have given me a lot to think

22  about.  As I said, I've already looked at all the exhibits

23  that were admitted one time.  I'm going to take an

24  opportunity to do that again.  So I'm going to take the

25  matter under advisement.  I will get you all an answer as

1  soon as I can.  And most likely you will get a notice of a

2  telephonic ruling hearing.

3      So with that the Court will take the matter under

4  advisement.  Thank you all for your time.  That concludes our

5  hearing.  You are excused.

6              MR. WILEY:  Thank you, Your Honor.

7              MS. SAX-BOLDER:  Thank you, Your Honor.

8                  (End of Proceedings.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                  C E R T I F I C A T E

2              I, CINDY SUMNER, do hereby certify that the

3       foregoing constitutes a full, true, and complete

4       transcription of the proceedings as heretofore set forth in

5       the above-captioned and numbered cause in typewriting before

6       me.

7

8

9

10

11

12

13

14                          /s/Cindy Sumner

15                  _____

16                  CINDY SUMNER, CSR #5832
                    Expires 10-31-2026
17                  Cindy Sumner, CSR
                    5001 Vineyard Lane
18                  McKinney, Texas 75070
                    214 802-7196
19

20

21

22

23

24

25